[Cite as *J.B. v. Harford*, 2015-Ohio-13.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| J.B. | | C.A. No. 27231 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| DAVID H. HARFORD | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CV 2013 12 5693 |

DECISION AND JOURNAL ENTRY

Dated: January 7, 2015

MOORE, Judge.

{¶1} Respondent, David Harford, appeals from the judgment of the Summit County Court of Common Pleas. We affirm.

I.

{¶2} On December 6, 2013, petitioner, J.B., who was then nineteen years old, filed a petition for a civil stalking protection order ("CSPO") against Mr. Harford, who was sixty-nine years old. After the parties appeared and testified at a hearing before the magistrate, the trial court issued a CSPO against Mr. Harford. The trial court further ordered that Mr. Harford not use, possess, or carry any deadly weapon and that he relinquish all deadly weapons to law enforcement. Mr. Harford timely appealed, and he now presents three assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT'S ORDER WAS AGAINST THE MANIFEST WEIGHT
OF THE EVIDENCE AND AN ABUSE OF DISCRETION[.]

**{¶3}** In his first assignment of error, Mr. Harford argues that the trial court's order was against the manifest weight of the evidence and constituted and an abuse of discretion. We disagree.

**{¶4}** First, we note that this case is governed by Civ.R. 65.1. "According to Civ.R. 65.1(F)(3), civil protection petitions may be referred to a magistrate for determination, but [CSPOs] are not 'magistrate's order[s]' as contemplated by Civ.R. 53(D) and are not subject to the requirements of Civ.R. 53 related to magistrate's orders" and magistrate's decisions. *R.C. v. J.G.*, 9th Dist. Medina No. 12CA0081-M, 2013-Ohio-4265, ¶ 5; Civ.R. 65.1(F)(3)(b). "[A CSPO] is a final appealable order that may be fully reviewed on appeal with or without objections being filed in the trial court." *A.S. v. P.F.*, 9th Dist. Lorain No. 13CA010379, 2013-Ohio-4857, ¶ 4, citing *R.C.* at ¶ 5. "Consequently, as in other civil cases, we review the evidence underlying [CSPOs] to determine whether sufficient evidence was presented or whether the [CSPO] is against the manifest weight of the evidence." *A.S.* at ¶ 4, citing *R.C.* at ¶ 6, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, paragraph two of the syllabus. "With respect to the scope of a protection order, however, we consider whether the trial court abused its discretion." *A.S.* at ¶ 4, citing *R.C.* at ¶ 15.

**{¶5}** In his first assignment of error, Mr. Harford challenges the granting of the order, but he does not in this assignment of error, challenge the scope of the order. Therefore, we review this assignment of error to decide if the order was against the manifest weight of the

evidence. *See A.S.* at ¶ 4. In determining whether a trial court's ruling is against the weight of the evidence:

> [t]he [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.

(Internal quotations and citations omitted.) *Eastley* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶6} "In order for a [CSPO] to issue, the trial court must find that the petitioner has shown by a preponderance of the evidence the respondent committed an act against the petitioner that would constitute menacing by stalking." *A.S.* at ¶ 6, citing *Lewis v. Jacobs*, 2d Dist. Montgomery No. 25566, 2013-Ohio-3461, ¶ 9. Menacing by stalking is prohibited by R.C. 2903.211(A)(1), which provides that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." [1]

{¶7} Here, Mr. Harford does not present an argument regarding whether he engaged in a "pattern of conduct." Instead, he argues that the weight of the evidence does not support the CSPO as it pertains to the elements of knowingly causing belief of physical harm or causing mental distress. We will limit our discussion accordingly.

{¶8} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C.

---

[1] The Ohio Supreme Court recently dismissed a case certifying the question of whether actual mental distress must be proven to demonstrate a violation of R.C. 2903.211(A)(1), as having been improvidently certified. *Fondessy v. Simon*, 2014-Ohio-4638, ¶ 1.

2901.22(B). "As to whether the offender engaged in the conduct at issue in order to 'cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person,' the State need not prove that the offender explicitly threatened the victim." *State v. Smith*, 9th Dist. Summit No. 25869, 2012-Ohio-335, ¶ 20. "Instead, the offender's knowledge that the conduct will result in the victim fearing physical harm or suffering mental distress can be inferred by the circumstances." *Id.* "Physical harm" includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶9} "Mental distress" is defined in R.C. 2903.211(D)(2) as:

(a) Any mental illness or condition that involves some temporary substantial incapacity; [or]

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

"Substantial incapacity does not mean that the victim must be hospitalized, or totally unable to care for herself. Incapacity is substantial if it has a significant impact upon the victim's daily life." *State v. Payne*, 178 Ohio App.3d 617, 2008-Ohio-5447, ¶ 9 (9th Dist.), quoting *State v. Horsley*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, ¶ 48.

{¶10} At the hearing on J.B.'s petition, both she and Mr. Harford appeared pro se. In support of her petition, J.B. presented her own testimony along with that of her coworkers: Colleen Glasscock and Sarah Sebrell, and Deputy Robert Alderman, Jr. J.B. testified that she began working at a Taco Bell restaurant when she was sixteen years old. While she worked there, Mr. Harford frequently would come in the restaurant, order a burrito, and sit inside for hours at a time. He would make remarks about J.B. that she found inappropriate, including that

she was beautiful and a model. He told J.B.'s manager that he wanted to see the manager in Victoria Secret underwear while her dog sat at her feet, and J.B. found this statement to be disturbing.

{¶11} J.B. did not see Mr. Harford for approximately three years after she stopped working at Taco Bell until he came into Lowes, which was one of her current places of employment. J.B. had assisted Mr. Harford when he called the store regarding a part for his dishwasher. When Mr. Harford called the store, J.B. did not know with whom she was speaking. When he came to get the part, J.B. escorted him to the plumbing department. He later came back into the store and asked Ms. Glasscock, J.B.'s financing manager, for J.B. by name.

{¶12} Ms. Glasscock testified that she worked with J.B. at Lowes. Ms. Glasscock recalled that Mr. Harford had come into Lowes a few weeks prior to the hearing and inquired about J.B. He said that he wanted to thank J.B. for the service she had given him, and Ms. Glasscock paged her. When J.B. did not respond, Ms. Glasscock told Mr. Harford that she may have gone to break or to lunch. He said he was just going to keep looking around and that Ms. Glasscock could go back to what she was doing. Ms. Glasscock went back to what she was doing and saw Mr. Harford sitting down at the appliance desk. Ms. Glasscock thought that was a long time to wait for an employee, and she approached Mr. Harford and told him that J.B. probably went home or to lunch. She then called the store manager, who advised her that J.B. had gone to lunch. Ms. Glasscock then confirmed to Mr. Harford that J.B. went to lunch and would not be back for about an hour, but Mr. Harford continued to sit and wait. Thereafter, Mr. Harford informed Ms. Glasscock that he was going to leave, and he asked Ms. Glasscock to thank J.B. Mr. Harford then informed Ms. Glasscock that he used to see J.B. at Taco Bell. Then he mentioned that he had found out that she worked at the YMCA, and he was thinking of

getting a membership there. Ms. Glasscock did not know that J.B. worked at Taco Bell or the YMCA prior to Mr. Harford informing her of this.

{¶13} J.B. testified that, in addition to her employment at Lowes, she worked at the YMCA in Green. J.B. had become concerned about Mr. Harford after she was informed that he had inquired of her at the YMCA when she never told him that she worked there.

{¶14} Sarah Sebrell testified that she worked with J.B. at the YMCA. Mr. Harford had come into the YMCA and told Ms. Sebrell that he was interested in a membership. She asked him questions and looked into whether he was eligible for the Silver Sneakers program, which is a YMCA program for older adults. She then took Mr. Harford on a tour of the facility. During the tour, Mr. Harford told Ms. Sebrell that he knew J.B. from Taco Bell, and he asked Ms. Sebrell if she was working. Ms. Sebrell replied that she was not. Mr. Harford then asked when J.B. worked next, and Ms. Sebrell told him that she did not know. Mr. Harford asked Ms. Sebrell if J.B. was a model yet, because he explained that he always thought she should be a model. Ms. Sebrell felt that the way Mr. Harford spoke of J.B. was strange, and it made Ms. Sebrell uncomfortable because of the age difference between J.B. and Mr. Harford. During their conversation, Mr. Harford stated that he was banned from Taco Bell, but he did not say why. He also told Ms. Sebrell about how J.B. had helped him at Lowes. Ms. Sebrell explained that Mr. Harford lingered after the tour of the facility, which she found odd because people inquiring about memberships at the YMCA usually left right after they received the tour and paperwork. However she wanted to make him feel welcomed at the facility.

{¶15} On cross-examination, Ms. Sebrell explained that Mr. Harford lingered at the YMCA for more than ten minutes after the tour. She did not recall if they spoke about J.B. during the time that he remained in the facility after the tour.

{¶16} J.B. further testified that Mr. Harford returned to Lowes a third time. When she saw him in the store, J.B. called the police because she was fearful of him. She stayed in the training room while he was there, and she later found out that Mr. Harford had a license to carry a concealed weapon (CCW), and he was carrying a firearm with him in the store.

{¶17} Deputy Alderman, of the Summit County Sheriff's Office, testified that he and another deputy arrived at Lowes in response to J.B.'s call. The manager escorted Deputy Alderman to the break room where J.B. was present. J.B. gave the deputy the location of Mr. Harford in the store, and the officers found him and escorted him outside. On the way out, Mr. Harford informed the officers that he had a CCW and that he was carrying a firearm at that time. The deputies secured the weapon while they spoke with Mr. Harford

{¶18} On cross-examination, the deputy acknowledged that when he encountered Mr. Harford, he did not appear to pose a threat. Mr. Harford did not give the deputies any difficulty in securing Mr. Harford's weapon, or any difficulty at all during their encounter. The deputies returned Mr. Harford's weapon to him after they concluded their conversation.

{¶19} At the hearing, J.B. maintained that she was fearful of physical injury by Mr. Harford because he was a lot larger than she and because he had shown up and inquired about her in places where she had never told him that she worked. Although, on cross-examination, J.B. acknowledged that she had identified herself by name to Mr. Harford when she assisted him over the telephone at Lowes, she did not know his identity at that time. J.B. was also concerned that Mr. Harford carried a firearm, and her concerns were heightened because she became aware that Mr. Harford was carrying the gun while he was in Lowes and that he had a civil protection order issued against him in regard to another person.

{¶20} Mr. Harford testified on his own behalf. He maintained that he did not recognize J.B. after he called and came into Lowes, but she did look familiar. The first time he saw her at Lowes, he said to her "You're not old like you said on the phone," and she just smiled at him.

{¶21} Because she had looked familiar, Mr. Harford maintained that he had searched for and found J.B.'s public profile on Facebook. He did not send her a message or bother her in any way through Facebook. From her Facebook page, Mr. Harford learned that J.B. worked at a YMCA in Akron. When he went to the YMCA in Green, Ms. Sebrell asked him if he knew anyone at the YMCA, and he responded that he knew J.B. Ms. Sebrell informed him that J.B. worked at the YMCA in Green. Mr. Harford went to the YMCA in Green for a membership because it was the closest YMCA to his home.

{¶22} Mr. Harford further maintained that, when he spoke with Ms. Glasscock at Lowes, he only inquired as to whether J.B. was on duty that weekend, and Ms. Glasscock told him that she had left early because business was too slow. He asked about J.B. because she had helped him before, and he wanted to thank her and give her credit for the sale. Ms. Glasscock informed him that J.B. would be there any weekend if he wanted to give her credit for the sale. He then looked at refrigerators and dishwashers while he was there, and he also sat down to look at the ad.

{¶23} Mr. Harford stated that he did not really remember J.B. much from Taco Bell, and she worked there only part-time because she was a minor, and she had to take breaks. He stated that he saw her there at most twice a month. He maintained that he never spent hours at Taco Bell. Instead, he usually came in twice a day, once for lunch and then for dinner.

{¶24} Mr. Harford considered J.B. a friend because she was very nice, and she was always polite. Because of this, he never gave it any thought that J.B. might be uncomfortable.

**{¶25}** On cross-examination, Mr. Harford denied that he ever told Ms. Glasscock that he knew that J.B. worked at the YMCA. He did not recall asking Ms. Sebrell about modeling, and he never told Ms. Sebrell that he got kicked out of Taco Bell.

**{¶26}** In support of his contention that the evidence did not establish that he caused J.B. to fear physical harm, Mr. Harford relies on the Seventh District case of *Caban v. Ransome*, 7th Dist. Mahoning No. 08 MA 36, 2009-Ohio-1034, and on the Fifth District case of *Baker v. Inman*, 5th Dist. Delaware No. 04CAE06045, 2004-Ohio-6133.

**{¶27}** In *Caban* at ¶ 1, the Seventh District determined that the trial court's grant of a CSPO was against the manifest weight of the evidence. In that case, the petitioner and respondent had been involved in a long-time romantic relationship. *Id.* at ¶ 2. After the relationship ended, the respondent engaged in a pattern of behavior which included leaving the petitioner numerous voicemail messages, and leaving her a message that "when he found her 'all bets are off.'" *Id.* at ¶ 3, 17. In concluding that the CSPO was against the weight of the evidence, the Seventh District noted that, at the hearing, the petitioner "did not state that she feared for her safety." *Id.* at ¶ 18. Instead, the Court determined:

> [I]t seems as if what she feared was that [the respondent] would confront her again and ask her again why she broke up with him after a fourteen-year relationship. The element of causing her to believe has subjective requirements. Labeling a call as threatening does not express a belief that the caller would cause physical harm. That is, threatening to approach a person for conversation is not a threat of physical harm. As such, we cannot find some competent, credible evidence to support a finding that appellant knowingly caused [the petitioner] to believe that he would cause her physical harm.

*Id.*

**{¶28}** However, unlike *Caban*, here J.B. did maintain in her testimony that she feared that Mr. Harford would cause her physical injury. She explained that this fear was based in part

upon Mr. Harford's statements toward her, his appearances at her places of employment where she had never told him that she worked, and the size difference between the parties.

{¶29} Mr. Harford cites to *Baker*, 2004-Ohio-6133, to conclude that proof of subjective fear alone cannot support a civil stalking protection order. In *Baker*, the Fifth District reviewed a CSPO that the trial court granted in favor of the petitioner, who had been in a romantic relationship with the respondent, a police officer. *Id.* at ¶ 2-3, 6. The conduct of the respondent since their break-up had caused petitioner to change her phone numbers and to have stress when leaving her home. *Id.* at ¶ 24. Her testimony primarily centered on her concern that, because the respondent was a police officer, he carried a weapon. *Id.* "The trial court concluded the evidence taken in its entirety supported a finding [that respondent] 'knowingly engaged in a pattern of conduct which would cause mental distress' to appellee." (Emphasis deleted). *Id.* at ¶ 23.

{¶30} On appeal, the Fifth District found "the trial court's determination [that the respondent's] pattern of conduct 'would cause *mental distress* to [petitioner]' [wa]s against the manifest weight of the evidence." (Emphasis added.) *Id.* at ¶ 24. Therefore, the Fifth District's decision in *Baker* focused upon the *mental distress prong* of menacing by stalking. However, in its analysis, the Fifth District stated, "The mere fact [that the respondent] is a police officer does not, in an[d] of itself, support a finding [that the respondent] knowingly engaged in a pattern of conduct to cause [the petitioner] to believe he would cause her harm, despite her subjective fear." *Id.* The Fifth District did not isolate the "fear of physical harm" prong of menacing by stalking in this sentence, and we do not read the case as standing for the proposition that the petitioner's fear must be objectively reasonable. Further, some courts have held that the petitioner's fear is judged by a subjective, rather than objective, test. *See Lane v. Brewster*, 12th Dist. Clermont No.

CA2011-08-060, 2012-Ohio-1290, ¶ 23, and *Fortney v. Willhoite*, 11th Dist. Lake No. 2011-L-120, 2012-Ohio-3024, ¶ 43. The reasonableness of the petitioner's fear may be relevant in determining whether the respondent *knowingly* caused such fear through his actions. *See* R.C. 2901.22(B), and *State v. Murphy*, 9th Dist. Summit No. 24753, 2010-Ohio-1038, ¶ 15 ("[i]f a given result is probable, a person will be held to have acted knowingly to achieve it because one is charged by the law with knowledge of the *reasonable* and probable consequences of his own acts." (Emphasis added.) (Internal quotations and citations omitted.)). *See also State v. Willett*, 9th Dist. Summit No. 25521, 2012-Ohio-1027, ¶ 17, *citing State v. Werfel*, 11th Dist. Lake No. 2006-L-163, 2007-Ohio-5198, ¶ 27 (noting that "[w]hile no one, including [the victim] herself, told [the defendant] directly that [the victim] desired [the defendant] to leave her alone, by his very actions, [the defendant] knowingly acted in such a way that would cause a reasonable person to feel threatened of physical harm and/or suffer mental distress[ ]").

{¶31} However, we need not determine in this case if the belief of physical harm prong of menacing by stalking independently requires an objective fear of physical harm, because there was evidence through which the trial court could determine that Mr. Harford knowingly caused J.B. to fear physical harm, and that such a fear was reasonable. The evidence presented by J.B. and her witnesses established that J.B. feared that Mr. Harford would cause her physical injury, that there was a large age and size difference between the parties, that Mr. Harford had made comments of an admiring nature pertaining to J.B. when she was a minor, and that he had appeared at her places of employment and inquired of her by name; although J.B. had not informed him of where she worked. The trial court could reasonably conclude that a preponderance of the evidence established that Mr. Harford acted knowingly, in that his actions

would probably cause J.B. to fear physical harm, that she did in fact fear physical harm, and that such a fear was reasonable.

{¶32} Therefore, we conclude that this is not the exceptional case where the trial court erred in concluding that the preponderance of the evidence demonstrated that Mr. Harford had engaged in menacing by stalking by engaging in a pattern of conduct knowingly causing J.B. to fear physical harm. Because the trial court's order is not against the weight of the evidence in that Mr. Harford knowingly caused J.B. to fear physical harm, we need not reach the issue of whether J.B. suffered mental distress. *See* R.C. 2903.211(A)(1), ("No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person *or* cause mental distress to the other person." (Emphasis added.)).

{¶33} Accordingly, Mr. Harford's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED PLAIN ERROR AND ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW WHEN IT ASSISTED PRO SE [J.B.] TO PRESENT HER CASE.

{¶34} In his second assignment of error, Mr. Harford argues that the trial court erred by assisting J.B. in the presentation of her case. We disagree.

{¶35} Mr. Harford challenges the trial court's following actions, which he argues unfairly advantaged J.B.: (1) relying on J.B.'s allegations contained in her petition as evidence, (2) taking judicial notice of a pre-existing CSPO issued against Mr. Harford in favor of an individual unrelated to this case, (3) conducting an independent investigation in violation of Rule 2.9 of the Ohio Code of Judicial Conduct by referencing the pre-existing CSPO, (4) violating

Evid.R. 404(B) by referencing and questioning the parties in regard to the pre-existing CSPO, and (5) improperly questioning J.B. and Officer Alderman to elicit hearsay testimony.

**{¶36}** Mr. Harford frames his assignment of error as challenging the magistrate's impartiality. An appellant's "assignment of error provides a roadmap for our review and, as such, directs our analysis of the trial court's judgment[.]" *State v. Brown*, 9th Dist. Summit No. 23637, 2008-Ohio-2670, ¶ 24. Civ.R. 53(D)(6) provides that "[d]isqualification of a magistrate for bias or other cause is within the discretion of the court and may be sought by motion filed with the court." Although Civ.R. 53(D)(2), (3), and (4)(e) do not apply to civil protection petitions, Civ.R. 65.1 does not affect the applicability of Civ.R. 53(D)(6) to the present matter. Therefore, the proper method of challenging the magistrate's impartiality or misconduct here was to have filed a motion for disqualification with the trial court. *Stalnaker v. Peterson*, 9th Dist. Summit No. 24071, 2008-Ohio-4329, ¶ 12. Mr. Harford never filed a motion seeking to disqualify the magistrate. "Accordingly, the trial court never had the opportunity to address the matter. This Court declines to address this matter for the first time on appeal, when it could have been raised in the trial court." *See King v. Carleton*, 9th Dist. Summit No. 13CA010374, 2013-Ohio-5781, ¶ 11 (9th Dist.), citing *Stalnaker* at ¶ 12.

**{¶37}** To the extent that Mr. Harford challenges the underlying evidentiary errors independently from that of the magistrate's purported unfair assistance of J.B., we note that Mr. Harford did not object at the magistrate's hearing to the magistrate's actions of which he now complains. Consequently, Mr. Harford has forfeited his arguments in this regard except that of plain error. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997). "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court,

seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Id.* at syllabus.

{¶38} We will separately review Mr. Harford's plain error challenges to (1) the magistrate's references to the current petition and pre-existing CSPO, and (2) his challenges to admissibility of hearsay evidence.

The Petition and the Pre-Existing CSPO

{¶39} In regard to J.B.'s petition for a CSPO, the magistrate discussed allegations contained in the petition prior to J.B.'s testimony. The context of the discussion, however, is relevant to our review. The magistrate asked Mr. Harford if he had the opportunity to familiarize himself with the reasons why J.B. sought the CSPO. Mr. Harford responded that he had obtained the petition within a week before the hearing. The magistrate later read allegations from the petition just prior to J.B.'s testimony.

{¶40} In regard to the pre-existing CSPO, early during the hearing, the magistrate raised the issue of the pre-existing CSPO, when he asked Mr. Harford if he was familiar with civil protection orders:

> THE COURT: Now, both of you two are pro se. [J.B.] has victim's assistance, and for the record, your name?
>
> VICTIM'S ASSISTANCE: * * *
>
> THE COURT: Mr. Harford, I assume you're familiar with civil protection matters because there currently exists a permanent order against you in a prior case; is that a fair statement?
>
> MR. HARFORD: No.
>
> THE COURT: No, what? No, you're not familiar, or no, there's not one against you?
>
> MR. HARFORD: I'm not really familiar with the procedures, as well as you said "permanent."

THE COURT: Okay. Well, just a second, please.

Back on March the 23rd, 2011 Judge Cosgrove entered a permanent order of protection in regard to you and the petitioner was [an individual other than J.B.], which is in effect until March the 18th of 2015, and that appears to be an order you consented to.

Does that refresh your memory?

MR. HARFORD: That is accurate now.

THE COURT: Okay.

MR. HARFORD: It's the "permanent" that I have a problem with.

THE COURT: Well, as opposed to a temporary order.

MR. HARFORD: Yes.

**{¶41}** Thereafter, during J.B.'s testimony, the magistrate asked J.B. if she was "now familiar with the fact that Mr. Harford has an existing civil protection order that's still in effect?" She responded that she was. The magistrate inquired as to whether she knew that the pre-existing CSPO was issued in regard to another woman that had problems with Mr. Harford, and the magistrate asked her if that knowledge heightened J.B.'s concerns about him. She responded in the affirmative.

**{¶42}** First, in regard to the petition, assuming without deciding that the magistrate improperly referenced the petition, we cannot agree that the magistrate engaged in plain error, as J.B. testified as to the allegations contained in her petition. *Grimm v. Summit Cty. Children Servs. Bd.*, 9th Dist. Summit No. 22702, 2006-Ohio-2411, ¶ 52, ("Plain error occurs when, but for the error, the outcome of the trial clearly would have been otherwise." (Citation omitted.)).

**{¶43}** In regard to the pre-existing CSPO, the magistrate's questions of Mr. Harford as to the pre-existing CSPO appear related to an inquiry of whether he was familiar with the judicial process, and do not appear designed to elicit evidence to be used in the present matter. The

magistrate's later question of J.B. as to the pre-existing CSPO appears related to ascertaining J.B.'s knowledge of the pre-existing CSPO and the impact of that knowledge on her fear of Mr. Harford. *See* Evid.R. 404(B) (evidence of other acts "not admissible to prove the character of a person in order to show action in conformity therewith" but is admissible for other purposes). Further, there is no indication in the magistrate's findings of fact that the magistrate relied on the pre-existing CSPO in granting J.B.'s petition. *See Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982) (a plain error is both obvious and prejudicial).

{¶44} Therefore, we cannot agree that the court's questions and references to the petition or the pre-existing CSPO amounted to plain error.

Hearsay

{¶45} In regard to Mr. Harford's argument pertaining to the purported hearsay, he maintains that the magistrate elicited and admitted hearsay testimony from J.B. and Deputy Alderman. "Hearsay is a statement, oral or written, made by someone other than the declarant while testifying, which is offered to prove the truth of the matter asserted in the statement." *Prakash v. Copley Tp. Trustees*, 9th Dist. Summit No. 21057, 2003-Ohio-642, ¶ 29, citing Evid.R. 801(A) and (C). "Hearsay is not admissible unless otherwise allowed by rule, statute or constitutional provision." *Prakash* at ¶ 29, citing Evid.R. 802.

{¶46} Here, Mr. Harford maintains that the magistrate elicited hearsay testimony of J.B. by asking her to provide police reports and elicited hearsay testimony from the deputy when the magistrate asked him to testify as to the contents of the police reports and what his partner had observed and stated at Lowes.[2]

---

[2] The transcript of the magistrate's hearing indicates that the police reports referenced in the testimony were admitted into evidence. However, the record transmitted on appeal contains no exhibits. *See Shumate v. Shumate*, 9th Dist. Lorain No. 09CA009707, 2010-Ohio-5062, ¶ 6,

{¶47} Early in Deputy Alderman's testimony, the magistrate referenced the report prepared when Deputy Alderman and another deputy responded to J.B.'s call from Lowes. Deputy Alderman advised the magistrate that the other deputy had prepared the report, but both officers were on duty that day. The magistrate then asked the deputy if he wanted to look at "that," seemingly referring to the police report prepared by the other deputy. The magistrate then asked Deputy Alderman, "You want to tell me what happened there at Lowe's?" Thereafter, Deputy Alderman provided a narrative of events for approximately two and half pages of testimony, generally describing the deputies' involvement with the parties at Lowes, uninterrupted by the trial court.

{¶48} Assuming without deciding that Deputy Alderman's testimony contained inadmissible hearsay, we are not persuaded that allowing this evidence constituted "obvious and prejudicial" error which "would have a material adverse affect on the character and public confidence in judicial proceedings." *See Schade*, 70 Ohio St.2d at 209.

{¶49} After a review of the magistrate's actions complained of here, we cannot say that this is the "extremely rare" situation in which plain error should be recognized in a civil case. *Goldfuss*, 79 Ohio St.3d 116, at syllabus.

{¶50} Accordingly, Mr. Harford's second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT COMMITTED PLAIN ERROR AND VIOLATED [MR. HARFORD'S] SECOND AMENDMENT CONSTITUTIONAL RIGHT TO BEAR ARMS WHERE THE EVIDENCE PRESENTED DID NOT SUPPORT THE PORTION OF THE ORDER REQUIRING [MR. HARFORD] RELINQUISH HIS FIREARMS TO LAW ENFORCEMENT[.]

---

("It is an appellant's duty to ensure that the record, or the portion necessary for review on appeal, is filed with the appellate court." (Citation omitted.)). We will limit our review to the purported hearsay elicited at the hearing and contained in the transcript.

**{¶51}** In his third assignment of error, Mr. Harford maintains that the trial court erred in requiring him to relinquish his firearms to law enforcement because there was no evidence that such a measure was necessary to ensure the safety of J.B. We disagree.

**{¶52}** R.C. 2903.214 provides, in pertinent part, as follows:

(E)(1)(a) After an ex parte or full hearing, the court may issue any protection order, with or without bond, *that contains terms designed to ensure the safety and protection of the person to be protected by the protection order, including, but not limited to*, a requirement that the respondent refrain from entering the residence, school, business, or place of employment of the petitioner * * *.

(Emphasis added.)

**{¶53}** Mr. Harford does not argue that a firearm restriction imposed pursuant to R.C. 2903.214 is unconstitutional. *See Gaydash v. Gaydash*, 168 Ohio App.3d 418, 423, 2006-Ohio-4080, ¶ 19 (9th Dist.) (declining to address similar constitutionality issue where appellant failed to develop a constitutionality argument). Instead, he maintains that the gun restriction was unnecessary in this case, as there was no evidence that this term of the CSPO was "designed to ensure the safety and protection" of J.B. in accordance with R.C. 2903.214. *See Mann v. Sumser*, 5th Dist. Stark No. 2001CA00350, 2002-Ohio-5103, ¶ 34.

**{¶54}** We review the scope of a protection order for an abuse of discretion. *A.S.*, 2013-Ohio-4857 at ¶ 4, citing *R.C.*, 2013-Ohio-4265, at ¶ 15. An abuse of discretion indicates that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶55}** Here, in the trial court's order, it required Mr. Harford to turn over his firearms to law enforcement and prohibited him from possessing any deadly weapon during the pendency of the order. It is undisputed that Mr. Harford has a license to carry a concealed firearm and was carrying a loaded firearm with him on his third relevant visit to Lowes. Further, the trial court

had before it testimony of Mr. Harford's statements to J.B. as a minor complimenting her on her physical appearance, his Facebook search for her, and his appearance at her places of employment, where he inquired of her by name, and where J.B. had not informed him that she worked. Given the totality of the evidence before it and reasonable inferences that could be drawn therefrom, we cannot say that the trial court's firearm restriction constituted an unreasonable, arbitrary, or unconscionable measure to protect J.B.

**{¶56}** Accordingly, Mr. Harford's third assignment of error is overruled.

### III.

**{¶57}** Mr. Harford's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

                                                  _____

                                                  CARLA MOORE
                                                  FOR THE COURT

BELFANCE, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

KANI HARVEY HIGHTOWER, Attorney at Law, for Appellant.

SUSAN M. FITCH, Attorney at Law, for Appellee.